# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Philip G. Reinhard | Sitting Judge if Other than Assigned Judge | P. Michael Mahoney |
|---|---|---|---|
| **CASE NUMBER** | 03 C 50293 | **DATE** | 9/15/2004 |
| **CASE TITLE** | Barone vs. Barnhart | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
     ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons stated on the attached Report, it is the Magistrate Judge's Report and Recommendation that Plaintiff's Motion for Summary Judgment be granted in part and denied in part and Defendant's Motion for Summary Judgment on the administrative record and pleadings be denied.

(11) ■ [For further detail see order attached to the original minute order.]

| | | number of notices | Document Number |
|---|---|---|---|
| | No notices required, advised in open court. | | |
| | No notices required. | | 18 |
| ✓ | Notices mailed by judge's staff. | 9-16-04 | |
| | Notified counsel by telephone. | date docketed | |
| | Docketing to mail notices. | | |
| | Mail AO 450 form. | docketing deputy initials | |
| ✓ | Copy to judge/magistrate judge. | 9/15/2004 | |
| | | date mailed notice | |
| AM | courtroom deputy's initials | GG | |
| | | mailing deputy initials | |

Date/time received in central Clerk's Office

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### WESTERN DIVISION

KIM BARONE,             )

                      )

    **Plaintiff,**       )     **Case No. 03 C 50293**

                      )

        **v.**           )     **Magistrate Judge**

                      )     **P. Michael Mahoney**

**JOANNE B. BARNHART,**   )

**COMMISSIONER OF SOCIAL**   )

**SECURITY,**           )

                      )

    **Defendant.**      )

## REPORT AND RECOMMENDATION

Kim Barone ("Plaintiff") seeks judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner"). *See* 42 U.S.C. §§ 405(g), 1383(c)(3). The Commissioner's final decision denied Plaintiff's application for Disability Insurance Benefits ("DIB") pursuant to Title II of the Social Security Act (the "Act"). 42 U.S.C. § 416, 423. This matter is before the Magistrate Judge for Report and Recommendation pursuant to Rule 72(b) and 28 U.S.C. §636(b)(1)(B).

## I. BACKGROUND

Plaintiff filed for DIB on April 27, 2001 (Tr. 112A), and her application for benefits was denied on July 2, 2001. (Tr. 86). Plaintiff filed a request for reconsideration which was accepted, but her application was denied after reconsideration on October 22, 2001. (Tr. 14). Plaintiff then filed a request for a hearing before an Administrative Law Judge ("ALJ") on November 9, 2001. (Tr. 94). Plaintiff appeared, with counsel, before an ALJ on May 14, 2002. (Tr. 22). In a decision dated June 28, 2002, the ALJ found that Plaintiff was not entitled to DIB.

(Tr. 14-19). On August 19, 2002, Plaintiff requested a review of the ALJ's decision by the Appeals Council. (Tr. 8). On June 19, 2003, the Appeals Council denied Plaintiff's request for review. (Tr. 5-8).

## II. FACTS

Plaintiff was born on February 22, 1970, and was thirty-two years old at the time of her May 14, 2002, hearing before the ALJ. (Tr. 26). Plaintiff completed her education through the twelfth grade. (*Id.*). At the time of the hearing, Plaintiff lived with her husband and two children, ages three and five. (Tr. 26-27). Plaintiff is approximately five foot two inches tall and weighed, at the time of the hearing, 150 pounds. (Tr. 27). According to Plaintiff, she had gained twenty-five pounds over the previous two years. (*Id.*). At the time of the hearing, Plaintiff's primary impairments were an unidentified autoimmune deficiency, bilateral knee arthritis, migraines, sleep problems, hair loss, and hip and back pain. (Tr. 25-26, 28, 43).

Plaintiff had no reported income since July 10, 2000. (Tr.30). Plaintiff worked for Conseco Services ("Conseco") as a customer service representative from October 1996 until July 2000. (Tr. 29-30). Plaintiff answered phones, completed data entry, and performed some audit work. (Tr. 91). Plaintiff received eleven dollars per hour for her services. (Tr. 128). Plaintiff's work was primarily sedentary, but Plaintiff could stand and stretch when needed. (Tr. 31). Plaintiff stated that she stopped working for Conseco due to a worsening of her knee and back pain which inhibited how long she could sit and stand. (Tr. 28, 31).

Plaintiff worked for Dodge City Toyota between 1993 and 1996 as a receptionist. (Tr. 127). Plaintiff answered the telephone and greeted customers. (Tr. 22). This position was also

primarily sedentary, but Plaintiff was free to walk around if she wanted. (*Id.*). Plaintiff was paid eight dollars an hour for her services. (Tr. 129).

Plaintiff worked from 1990-93 as a bank teller for Home Bank and was paid at a rate of seven dollars an hour. (Tr. 127, 130). Plaintiff was required to stand for much of the workday and performed some lifting, sometimes up to ten pounds. (Tr. 33). Plaintiff also testified that she was required to stand continuously for three hours at a time when she worked as a teller. (*Id.*).

Plaintiff also held two different cashier positions, paying six dollars an hour from 1985 to 1990. (Tr. 127, 131, 132). In addition to checking-out customers, Plaintiff did inventory, stock work, and answered phones. (Tr. 34). She was occasionally required to lift twenty pounds and to stand two hours at a time. (*Id.*).

Plaintiff described her typical day since she stopped working as beginning at 4:00 a.m. because she wakes early due to her pain. (Tr. 37). Plaintiff then lies in bed until her children wake up. (Tr. 38). Plaintiff then fixes her children a simple breakfast like cereal. (*Id.*). Plaintiff's children watch movies, play PlayStation, and read with their mother. (Tr. 38). Plaintiff states that she cannot engage in physical activities with the children, but she instead lays down on the couch. (*Id.*).

Plaintiff's husband performs most of the normal household tasks like cooking meals, cleaning, laundry, yard work, and grocery shopping. (Tr. 39). Plaintiff does assist her husband with the dishes, which she stated takes her ten minutes a day. (*Id.*). Plaintiff also occasionally runs the vacuum and goes grocery shopping, but the couple usually orders cooked food. (*Id.*). During the day, Plaintiff sometimes takes her kids to visit her mother who lives five minutes away and to the McDonald's Playland for fun. (Tr. 40-41). Plaintiff's mother also visits

3

Plaintiff's home almost daily to help care for the children. (Tr. 49). In addition, Plaintiff's mother-in-law and husband care for the children in the evenings. (*Id.*).

Plaintiff testified that her pain interferes with her daily routine, though there is no particular schedule as to when her knees, hips, back, or headaches will flare up. (Tr. 41). Plaintiff has been bothered by hip pain since the third grade, but the pain has been more frequent in the last five years. (Tr. 43). When her hips hurt, Plaintiff has difficulty getting dressed and is greatly restricted in her movement. (Tr. 41-42). Plaintiff stated at her hearing that her hips usually hurt her once or twice a week and that the pain lasts approximately two and a half days. (Tr. 42). When she is in pain, it is hard for her to walk, sit, and lay down. (*Id.*). When Plaintiff worked and her hip pain bothered her, she would use a heating pad and take a hot bath on her lunch breaks. (Tr. 43.) Plaintiff testified that the heating pad does not get rid of her pain now. (*Id.*).

Plaintiff also described almost constant lower back pain at her hearing. (Tr. 43). Plaintiff stated that this pain began two years prior to the hearing. (Tr. 44). The pain is off and on, but requires her to shift her position during the day every twenty to thirty minutes. (*Id.*). Plaintiff's migraines started three and one-half years before her hearing, and come in spurts. (Tr. 44-45). For about two years prior to her hearing, Plaintiff stated that her migraines occurred once a week and sometimes more frequently, up to every day of the week. (Tr. 45). Plaintiff was taking there different headache medications, including Imitrex, at the time of her hearing, but stated that they were ineffective at fully relieving her pain. (Tr. 44).

Plaintiff also testified that she has difficulty sleeping at night due to her pain. (Tr. 46-47). Before bed at 9:00 p.m., Plaintiff would take Amitriptyline and other medications to help

her sleep, but still would only sleep for two hours at a time. (Tr. 47). Plaintiff reported that she slept with heating pads, but noted they would only take the edge off her pain. (*Id*.). Plaintiff reported that she takes a hot bath every night when she cannot get back to sleep, sometimes two or three. (Tr. 48). Plaintiff also takes baths during the day (usually twice) to help with her pain. (Tr. 56).

Additionally, Plaintiff suffers from knee pain. She stated that her knee pain had worsened over the years and that during the two years prior to her hearing, her knees were swollen and sore so that she has difficulty bending and straightening her legs three to four days a week. (Tr. 54-55). She stated that she has to scoot on her butt to navigate stairs. (Tr. 54). Plaintiff's doctor aspirated her knees to relieve swelling about once a month for one and a half years prior to Plaintiff's hearing. (Tr. 56-57).

At the time of Plaintiff's hearing, she took ten prescription medications,[1] many of which were for pain, but Plaintiff also saw her doctor for shots of Demerol when her medications were not working. (Tr. 49-50). Plaintiff represented that she could sit continuously for twenty minutes before she needed to adjust her position (Tr. 58), stand for twenty minutes before needing to sit, lie down, or take a hot bath (Tr. 59), and walk two to three blocks at a time. (*Id*.).

Vocational expert, Christopher Yep, testifying before the ALJ stated that Plaintiff's work history ranged from light to sedentary work and unskilled to skilled work. (Tr. 70). Mr. Yep found that Plaintiff's cashier positions were unskilled positions with a light exertional level required. (Tr. 70). Plaintiff's position with Conseco was a skilled job with a sedentary exertional level (*Id*.), while her position as a teller was light and semi-skilled (Tr. 72), and her

---

[1]Vicodin (every four hours), Tylenol #3 (every four hours), Norco (four times a day), Inderal (twice a day), Imitrex (as needed), Elaril (every night), Ambien (every night), Parafon Forte (four times daily), Baclofen (once or twice daily), Vitamin D and Calcium (800-1200 mg a day).

position with Anderson Dodge was a semi-skilled sedentary occupation (Tr. 71). The ALJ then

questioned Mr. Yep about the existence of positions in the region that were sedentary, but

allowing the employee to sit/stand as needed. Mr. Yep stated that such an "at will" requirement

would significantly reduce the number of positions available to the Plaintiff, but that such

positions did exist in the region (the state of Illinois). (Tr. 71-72, 77).

With that in mind, the ALJ asked Mr. Yep whether a hypothetical female, with the

following characteristics, could perform prior work:

> Is 32 years of age, has a high school education with the ability to
> read, write, and use numbers, has the same prior work history as
> the Claimant with the capacity to perform work with the following
> and no other additional limitations. . . . say lift and carry up to a
> maximum of 10 pounds on an occasional basis and five pounds
> frequently. Let's say stand and walk for up to a combined total of
> two hours in an eight-hour day. Sit for a total of six hours in an
> eight-hour day. May not climb ladders, ropes, or scaffolds, may
> otherwise climb ramps and stairs. Be able to stoop, kneel, crouch,
> or crawl no more than an occasional basis.

(Tr. 74).

Mr. Yep testified that such a hypothetical female could still perform the work at Conseco

and Anderson Dodge. (Tr. 74). The ALJ then added the "at-will" sit/stand requirement to the

hypothetical and inquired as to the impact on the two jobs. (Tr. 74-75). Mr. Yep replied that the

restriction would have no impact as to the jobs. (Tr. 75). Mr. Yep also qualified his statement,

noting that semi-skilled occupations would require at least thirty minutes continuous sitting. (Tr.

79). The ALJ then inquired into other jobs besides the two previously held by Plaintiff, and Mr.

Yep testified that 29,601 other receptionist positions would be available as well as 10,707

telephone solicitation positions. (Tr. 81). Finally, the ALJ added to the hypothetical the

requirement that one has to bathe two or three times during the day, and Mr. Yep responded that

their would be no employment for such a person. (Tr. 81-82).

III. **MEDICAL HISTORY**

Plaintiff's earliest medical records before this court are office visits to an orthopaedic and arthritis clinic dating August 25, August 26, September 3, and September 13 1999. (Tr. 270-72, 280). Twenty-seven years of age at the time, Plaintiff sought treatment for bilateral knee pain which she claimed had been present for years, but which had become more progressive in her right knee. (*Id.*). On the 25th, Plaintiff was treated for a right knee effusion and a rash. (Tr. 272). On the 26th, Dr. Steven Mull recorded a 2+ effusion of Plaintiff's right knee. (Tr. 271). During a follow-up on September 3rd, Dr. Mull recorded a 4+ knee effusion despite Plaintiff's taking Anaprox, then Vicoprofen. (*Id.*). Dr. Mull prescribed Indocin and Vicodin instead. (*Id.*). On September 13, Plaintiff's knee was aspirated and injected with cortisone. (Tr. 280).

On September 22, 1999, Dr. Mull examined Plaintiff, noted a remaining effusion of Plaintiff's knee, and tested for rheumatoid arthritis and meniscal pathology. (Tr. 148). During this visit, Dr. Mull also reviewed the past medical history of Plaintiff, noting that Plaintiff underwent a meniscectomy approximately seventeen years previously and that Plaintiff suffered intermittent bilateral hip pain. (Tr. 147). In a follow-up visit with Dr. Mull on October 6, 1999, Plaintiff's right knee had improved, but her left knee showed joint effusion. (Tr. 148). Dr. Mull recommended that Plaintiff continue stretching and that if problems continued, he would administer another intraarticular injection. (Tr. 149). Plaintiff tested negative for rheumatoid arthritis at this visit. (Tr. 148).

On February 16, 2000, Plaintiff saw a Dr. Olson for knee pain in both her right and left knees and her right elbow. (Tr. 155). Dr. Olson noted Plaintiff's previous problems with knee and hip pain and noted that she had tested positive for rheumatoid factor in the past. (*Id.*). Dr.

7

Olson also noted that Dr. Mull had administered six to eight knee aspirations and injections for the Plaintiff. (Tr. 155). Dr. Olson also recommended treatment via aspirations and injection with corticosteroids. (*Id.*). In a follow-up visit with Dr. Olson on March 10, 2000, Plaintiff had responded well to the injections and was nearly asymptomatic. (Tr. 156). The doctor, however, suggested a full liver panel as he suspected Plaintiff could have hepatitis. (Tr. 157). In another visit with Dr. Olson on April 7, 2000, Plaintiff reported pain in her knees, hips, and elbow which caused her discomfort, but not severe pain. (*Id.*). Plaintiff reported taking Tylenol and rarely Tylenol #3 for her pain. (Tr. 157). Dr. Olson prescribed Sulfasalazine for Plaintiff and continued her on Vioxx. (*Id.*).

Plaintiff visited Dr. Mull several times in 2000 and 2001. On February 8, 2000, Dr. Mull reported 3+ effusion in Plaintiff's right knee and 2+ in her left knee. (Tr. 177). On March 10, 2000, Mr. Mull discussed treatment for loss of libido with Plaintiff. (*Id.*). On August 3rd and August 9th, 2000, Plaintiff saw a Dr. Mueller in Dr. Mull's office for skin dermatitis that did not respond to Kenalog cream. (Tr. 176). Plaintiff met with Dr. Mull on February 27, 2001, with complaints of cervical lumbar back pain. (Tr. 174). Dr. Mull prescribed a muscle relaxant, Amitriptyline, and referred Plaintiff to the Mayo Clinic to see if they could link Plaintiff's problems because they all appeared to be autoimmune problems. (*Id.*). Plaintiff was prescribed crutches on April 3, 2001, by Dr. Mull for help with her knee effusions and arthritis. (Tr. 173). On April 19, 2001, Plaintiff reported to Dr. Mull knee pain and insomnia due to waking in pain. (Tr. 172). Plaintiff noted that she was only getting three or four hours of sleep even with Ambien. (*Id.*). Dr. Mull continued treatment with Ambien. (*Id.*). Plaintiff was also seen for hair loss, knee arthritis, and abnormal B12 levels on May 14, 2001. (Tr. 288).

Dr. Mull sent Plaintiff to the University of Wisconsin Hospital for consultation on April

24, 2001, due to her perplexing symptoms. (Tr. 180). Dr. Malone, Professor of Medicine at

Wisconsin, filed an extensive report that is before the court. (Tr. 192). In his report to Dr. Mull,

Dr. Malone noted Plaintiff's intermittent hip, knee, and back pain, stating:

> The pain is severe enough to require narcotics, but she finds the at
> the narcotics are not very helpful, only take the edge off the pain
> and allow her to function. She has tried Vioxx and sulfazine,
> which did not help. She has had corticosteriod injections into both
> knees. This apparently has no effect on subsequent arthritic
> episodes and does not terminate the current episode. She has tried
> oral prednisone. This has had no effect on her knee swelling.

(Tr. 192).

In addition to Plaintiffs joint pains, Plaintiff suffers from Alopecia which has caused

major hair loss all over her body since age sixteen. (Tr. 192). Dr. Malone also noted Plaintiff's

sleep disruption and continuous daytime fatigue. (*Id.*). The doctor's physical examination

revealed hip limitation "that appears to be mechanical to internal and external rotation, and also

to abduction." (Tr. 194). Examination of Plaintiff's knees revealed bilateral moderate-to-large

knee effusions. (*Id.*). Dr. Malone characterized Plaintiff's symptoms as a "difficult to describe

neuro-endocrinological-immunilogical problem" and referred her to an endocrinologist. (*Id.*).

Plaintiff was seen at the University of Wisconsin endocrine clinic on May 31, 2001. (Tr.

187-89). Dr. Melissa Meredith noted that Plaintiff's hip problems since about the third grade

were attributed to a congenital deformity of the hip and also noted that X-rays were consistent

with degenerative disease in the hips. (Tr. 187). Dr. Meredith also commented on Plaintiff's

fatigue and anemia, noting that is had increased in the last two to three years, that her activities

had decreased, and that Plaintiff had gained about twenty pounds in the last year. (*Id.*). Dr.

Meredith's assessment was that Plaintiff did have some underlying autoimmmune syndrome and recommended thyroid testing. (Tr. 189).

Plaintiff saw Dr. Kamlesh Ramchandani at the request of state disability examiners on June 12, 2001. (Tr. 184-86). Dr. Ramchandani noted the Plaintiff's gait was normal unassisted, that she is able to walk, squat, and get on and off the examination table without difficulty. (Tr. 185). Plaintiff was also able to pick up objects, make a fist, and turn pages. (*Id.*). Dr. Ramchandani's physical examination revealed minimal tenderness on the medial aspect of both knee joints and that range of motion was painful at the knees and hips. (*Id.*). The doctor recorded his impression as "1. Autoimmune syndrome, of undetermined category, with polyarthalgias and alopecia. 2. Arthritis of the hip joints and the knee joints." (Tr. 185).

On June 25, 2001, a state agency physician examined Plaintiff's medical records and found that Plaintiff could perform medium work with occasional postural limitations. (Tr. 215-21). Specifically, the physician found that Plaintiff could occasionally lift fifty pounds, frequently lift twenty-five pounds, and stand/walk/sit (with normal breaks) for about six hours a day. (Tr. 215).

Plaintiff has also been treated for headaches by Dr. Mull's office. On August 22, 2001, Plaintiff complained of a classic migraine that lasted two days despite taking OxyContin, Tylenol #3, and Imitrex. (Tr. 205). At the August visit, Plaintiff stated that she had been getting migraines more frequently, usually one or two a week, and that they would last for one to two days. (*Id.*). Dr. Mueller prescribed Inderal. (*Id.*). On September 11, 2001, Plaintiff saw Nurse Helmond with another migraine, her first since taking the Inderal, and described her pain as a

nine on a nine-to-ten scale. (Tr. 204). Plaintiff was given Demerol and Vistaril for her pain. (*Id.*).

An endocrinologist, Dr. Gordon from Loyola University Medical Center, consulted with Dr. Mull on Plaintiff's case on October 18, 2001, but was unable to find evidence of an endocrine disease. (Tr. 211-13). Dr. Aileen Lorenzo Pangan, a Rheumatologist also at Loyola evaluated Plaintiff on October 23, 2001. (Tr. 250). Plaintiff's knees were aspirated and blood work was done because the doctor suspected C1 esterase inhibitor deficiency. (*Id.*).

On April 8, 2002, Dr. Mull issued the following as his opinion on Plaintiff's disability:

> Kimberly was a patient of mine until the beginning of the year
> when she had an insurance change. She has been treated for
> chronic hip and knee pain. It has appeared arthritic associated with
> effusions of the knees. She has been severely debilitated by her
> illness. This has not been clearly defined despite evaluations at the
> University of Wisconsin, Loyola Medical Centers, and by a local
> Rheumatologist. Her condition would certainly preclude most
> forms of work, especially anything that required standing or
> walking and she would likely experience problems even with
> sitting when her hip symptoms are flaring up.

(Tr. 313). Dr. Werckle, Plaintiff's most recent treating physician in the record, issued the following as his opinion on May 10, 2002:

> It is of my medical opinion, my patient is disabled due to her knee
> swelling and pain, and pain in her hips bilaterally. . . . She also has
> a history of migraine headaches and back pain that interfere with
> her ability to be employed. She also has insomnia. She presently
> is on pain medication and sleep medication.

(Tr. 314). Dr. Werckle has also referred Plaintiff to the Mayo Clinic. (Tr. 315).

## IV. <u>STANDARD OF REVIEW</u>

The court may affirm, modify, or reverse the ALJ's decision outright, or remand the proceeding for rehearing or hearing of additional evidence. 42 U.S.C. § 405(g). Review by the

court, however, is not *de novo*; the court "may not decide the facts anew, reweigh the evidence or substitute its own judgment for that of the [ALJ]." *Binion v. Charter,* 108 F.3d 780, 782 (7th Cir. 1997); *see also Maggard v. Apfel,* 167 F.3d 376, 379 (7th Cir. 1999). The duties to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide the case accordingly are entrusted to the commissioner; "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the responsibility for that decision falls on the Commissioner." *Schoenfeld v. Apfel,* 237 F.3d 788, 793 (7th Cir. 2001). If the Commissioner's decision is supported by substantial evidence, it is conclusive and this court must affirm. 42 U.S.C. § 405(g); *see also Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002). "Substantial evidence" is "evidence which a reasonable mind would accept as adequate to support a conclusion." *Binion,* 108 F.3d at 782.

The Seventh Circuit demands even greater deference to the ALJ's evidentiary determinations. So long as the ALJ "minimally articulate[s] his reasons for crediting or rejecting evidence of disability," the determination must stand on review. *Scivally v. Sullivan,* 966 F.2d 1070, 1076 (7th Cir. 1992). Minimal articulation means that an ALJ must provide an opinion that enables a reviewing court to trace the path of his reasoning. *Clifford v. Apfel,* 227 F.3d 863, 874 (7th Cir. 2000); *Rohan v. Charter,* 98 F.3d 966, 971(7th Cir. 1996). Where a witness credibility determination is based upon the ALJ's subjective observation of the witness, the determination may only be disturbed if it is "patently wrong" or if it finds no support in the record. *Pope v. Shalata,* 988 F.2d 473, 487 (7th Cir. 1993); *Stuckey v. Sullivan,* 881 F.2d 506, 509 (7th Cir. 1989). "However, when such determinations rest on objective factors of fundamental implausibilities rather than subjective considerations, [reviewing] courts have

12

greater freedom to review the ALJ decision." *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994); *Yousif v. Chater*, 901 F. Supp. 1377, 1384 (N.D. Ill. 1995).

## V.    **FRAMEWORK FOR DECISION**

The Commissioner has established a sequential five-step process to evaluate disability claims. 20 C.F.R. § 404.1520 (2003). If disability or lack of disability is determined at any step in the process, the evaluation ends. 20 C.F.R. § 404.1520(a). The Commissioner begins by asking whether a claimant is presently engaged in employment that qualifies as substantial gainful activity ("SGA"). 20 C.F.R. § 404.1520(b). If the answer is yes, the claimant is deemed not disabled. *Id.* If the answer is no, the Commissioner next asks whether the claimant has any impairment or combination of impairments that significantly limits the claimant's ability to perform basic work activities. 20 C.F.R. § 404.1520(c). If the answer is no, the claimant is found to be not disabled. *Id.* If the answer is yes, the Commissioner then determines whether the claimant's impairments meets or equals a listed impairment. 20 C.F.R. § 404.1520(d). If the answer is yes, the Commissioner will find that the claimant is disabled. *Id.* If the answer is no, the Commissioner then inquires whether the claimant's impairments prevent him from doing past relevant work. 20 C.F.R. § 404.1520(e). If the answer is no, the claimant is not disabled. *Id.* If the answer is yes, the Commission finally asks whether the claimant's impairments prevent him from doing any other work. 20 C.F.R. § 404.1520(f). If the answer is yes, a determination of disability is made. If the answer is no, the claimant is determined not to be disabled. *Id.* Plaintiff bears the burden proof in steps one through four. *Young v. Sec'y of Health & Human Services*, 957 F.2d 386, 389 (1992). At step five, the burden shifts to the Commissioner. *Id.*

## VI.    ANALYSIS

The court will proceed through the five step analysis in order.

### A. Step One: Is the claimant currently engaged in substantial gainful activity?

The ALJ found no evidence of work after the Plaintiff's application date.  (Tr. 15).
Neither party disputes this first determination by the ALJ, and there is substantial evidence to
support the determination of the ALJ.  Thus, it is the Magistrate Judge's Report and
Recommendation that the ALJ's determination as to Step One of the Analysis be affirmed.

### B. Step Two:  Does the claimant suffer from a severe impairment?

In performing the Step Two Analysis, the ALJ found that Plaintiff suffered from severe
impairments.  Specifically, the ALJ found that Plaintiff suffered from autoimmune syndrome,
degenerative disease of the knees and hips, alopecia totalis, and migraine headaches.  (*Id.*).

Substantial evidence exists to support the ALJ's determination that Plaintiff suffers from
severe impairments.  Though the finding does not mention Plaintiff's complaints of back pain,
the finding is not challenged by either party and the court finds no reason to disturb it.  It is the
Magistrate Judge's Report and Recommendation that the ALJ's determination as to Step Two of
the Analysis be affirmed.

### C.    Step Three:  Does claimant's impairment meet or medically equal an impairment in the Commissioner's listing of impairments?

In performing the analysis for Step Three, the ALJ determined that Plaintiff's
impairments do not meet or equal any impairment in the Listing of Impairments.  20 C.F.R. §
404.1520(d); 20 C.F.R. Pt. 404, Subpt. P, App. 1.  (Tr. 15).  The ALJ found, in one conclusory
sentence, that Plaintiff's "condition does not satisfy that standard."  (*Id.*).  As this court has seen

on numerous occasions, the ALJ failed to discuss, or even cite the listing relevant to Plaintiff's disability claim. Depending on the circuit, this omission alone would dictate remand. *Compare Burnett v. Commissioner*, 220 F.3d 112, 119-20 (3d Cir. 2000)(remanding where the ALJ "'merely stated a summary conclusion that appellant's impairments did not meet or equal any Listed Impairments,' without identifying the relevant listed impairments, discussing the evidence, or explaining his reasoning.")(*citing Clifton v. Chater*, 79 F.3d 1007, 1009)(10th Cir. 1996)), *with Senne v. Apfel*, 198 F.3d 1065, 1067 (8th Cir. 1999)(holding that the conclusory form of the ALJ's decision alone does not justify remand).

However, the Seventh Circuit has not decided whether failing to discuss or even cite a Listing at step three justifies remand. *See Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)(stating the Seventh Circuit need not address the tension between the circuits as to whether a conclusory statement at Step Three is fatal because the ALJ's decision could not stand even if she cited the correct rule). Even though the Seventh Circuit has not provided guidance on this issue, principles of administrative law require the ALJ to rationally articulate the grounds for his/her decisions thereby building "an accurate and logical bridge from the evidence." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). This then allows the court to confine review to the reasons supplied by the ALJ. *See Johnson v. Apfel*, 189 F.3d 561, 564 (7th Cir. 1999); *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996).

The question then remains whether this court should remand because of the ALJ's failure to cite the listing or whether this court should determine whether remand is necessary given the medical record. The problem with the latter is that it necessitates that this court weigh evidence when that is not the role of this court in this process. However, because the findings at Step

Three are so conclusory it is difficult to ascertain the process of this ALJ. Therefore, for the sake

of judicial efficiency, this court will adopt a standard to handle conclusory Step Three analysis.

That standard will be whether a reasonable ALJ could find that Plaintiff's impairments meet or

medically equal an impairment in the listings.

Listing 1.02 states:

> *Major dysfunction of a joint(s) (due to any cause)*: Characterized
> by gross anatomical deformity (e.g., subluxation, contracture, bony
> or fibrous ankylosis, instability) and chronic joint pain and
> stiffness with signs of limitation of motion or other abnormal
> motion of the affected joint(s), and findings on appropriate
> medically acceptable imaging of joint space narrowing, bony
> destruction, or ankylosis of the affected joint(s). With:
> A. Involvement of one major peripheral weight-bearing joint (i.e.,
> hip, knee, or ankle), resulting in inability to ambulate effectively,
> as defined in 1.00B2b; or
> B. Involvement of one major peripheral joint in each upper
> extremity (i.e., shoulder, elbow, or wrist-hand), resulting in
> inability to perform fine and gross movements effectively, as
> defined in 1.00B2c.

Listing 14.09 states:

> *Inflammatory arthritis*. Documented as described in 14.00B6, with
> one of the following:
> A. History of joint pain, swelling, and tenderness, and signs on
> current physical examination of joint inflammation or deformity in
> two or more major joints resulting in inability to ambulate
> effectively or inability to perform fine and gross movements
> effectively, as defined in 14.00B6b and 1.00B2b and B2c; or
> B. Ankylosing spondylitis or other spondyloarthropathy, with
> diagnosis established by findings of unilateral or bilateral
> sacroiliitis (e.g., erosions or fusions), shown by appropriate
> medically acceptable imaging, with both: 1. History of back pain,
> tenderness, and stiffness, and 2. Findings on physical examination
> of ankylosis (fixation) of the dorsolumbar or cervical spine at 45°
> or more of flexion measured from the vertical position (zero
> degrees); or C. An impairment as described under the criteria in
> 14.02A. or D. Inflammatory arthritis, with signs of peripheral joint
> inflammation on current examination, but with lesser joint

16

involvement than in A and lesser extra-articular features than in C, and:
1. Significant, documented constitutional symptoms and signs
(e.g., fatigue, fever, malaise, weight loss), and 2. Involvement of
two or more organs/body systems (see 14.00B6d). At least one of
the organs/body systems must be involved to at least a moderate
level of severity; or E. Inflammatory spondylitis or other
inflammatory spondyloarthropathies, with lesser deformity than in
B and lesser extra-articular features than in C, with signs of
unilateral or bilateral sacroiliitis on appropriate medically
acceptable imaging; and with the extra-articular features described
in 14.09D.

Both Listing 1.02 and 14.09 require the inability of claimant to ambulate effectively or to

perform fine and gross movements effectively. Though Plaintiff testifies about her use of

crutches and inability to climb stairs three or four days of the week (Tr. 54), the record does

reflect several instances when Plaintiff's doctors have found that she is able to ambulate

effectively. *See, e.g.,* Tr. 184-86. In addition, Listing 1.02 requires gross anatomical deformity

which is not clearly established in this record. Plaintiff's knee X-rays revealed no significant

joint space narrowing or osteophyte formation. (Tr. 147). Finally, neither party challenges the

ALJ finding under Step Three. Therefore, this court finds that no reasonable ALJ could find that

Plaintiff is disabled under the Listings. Substantial evidence exists to support the ALJ's Step

Three finding and this court finds no reason to disturb it. Therefore, it is the Magistrate Judge's

Report and Recommendation that the ALJ's determination as to Step Three of the Analysis be

affirmed.

**D.     Step Four: Is the claimant capable of performing work which the claimant
performed in the past?**

In performing the analysis under Step Four, the ALJ determined that Plaintiff is capable

of performing her past jobs in customer service at Conseco and as a receptionist at Anderson

Dodge. (Tr. 15). Before doing so, the ALJ determined Plaintiff's RFC. (*Id.*). The RFC is what

a claimant can still do despite his or her limitations. *See* 20 C.F.R. §416.945. After considering

the entire record, the ALJ stated that Plaintiff's medically determinable impairments precluded

the following:

> [l]ifting and/or carrying up to 10 pounds more than occasionally or
> five pounds more than frequently, standing and/or walking for
> more than a combined total of two hours in an eight hour workday
> or for longer than 15 minutes continuously; sitting for more than
> six hours with normal breaks in an eight hour workday, but must
> be allowed to alternate between standing and sitting positions as
> needed during the course of the workday; may not climb ladders,
> ropes or scaffolds, but may otherwise climb ramps/stairs; and
> balance, stoop, kneel, crouch, crawl no more than occasionally.

(Tr. 15). In support of the RFC statement, the ALJ expressed that Plaintiff's "complaints of

disabling symptoms are not considered entirely credible." (Tr. 18). Further, the ALJ found that

the opinions of Plaintiff's treating physicians (Dr. Mull and Dr. Werckle) were "not fully

supported by the longitudinal record of treatment and evaluation." (Tr. 17).

The finding of the ALJ as to Step Four of the Analysis is challenged by Plaintiff.

Specifically, Plaintiff argues that the ALJ erred, as a matter of law, in failing to give controlling

weight to the treating source's medical opinions regarding Plaintiff's RFC and for failing to

articulate specific and legitimate reasons for not giving controlling weight to the opinions. First,

Plaintiff argues that the ALJ should have given more weight to Plaintiff's treating sources

because they found Plaintiff's limitations greater in severity then the non-treating sources who

the ALJ appeared to follow in the limitation assessment. In support of this argument, Plaintiff

points to her longtime treating relationship with Dr. Mull and the many treatment records from

treating and consulting sources describing Plaintiff's condition. Plaintiff also relies on the opinion of Dr. Werckle, who became Plaintiff's treating physician due to insurance changes.

Defendant argues that substantial evidence in the record supports the ALJ's decision not to give controlling weight to the opinions of Drs. Mull and Werckle.[2] First, Defendant notes that the ALJ did give "significant deference" to Dr. Mull's opinion in setting Plaintiff's RFC. (Def.'s Mem. Supp. Summ. J. at 13). It does appear that the ALJ did restrict Plaintiff's jobs to primarily sedentary jobs based on Dr. Mull's opinion (rather than to medium work, recommended by the state agency physician). Second, Defendant argues that the ALJ's decision that Dr. Mull's opinion was not entitled to controlling weight was based on Plaintiff's "longitudinal treatment record which included several reports which described her symptoms as responding favorably to treatment." (*Id.* at 14). Specifically, Defendant cites: (1) Dr. Olson's report that Plaintiff was nearly asymptomatic after a steroid injection and ambulating normally (Tr. 156), (2) the fact that Plaintiff's medications were somewhat effective at controlling her pain (Tr. 157), (3) the fact that favorable findings were reported by Plaintiff's consulting sources and that she was treated conservatively by them (Tr. 172, 174, 188, 193-94, 212-13), and (4) Dr. Ramchandani's report. (Tr. 185).

The Seventh Circuit is not clear on the weight given a treating physician over a non-treating physician. In fact, there appears to be some conflict in the Seventh Circuit on the weight

---

[2]Dr. Werckle's opinion was discounted by Defendant as Dr. Werckle was only briefly Plaintiff's treating physician and because Dr. Werckle's opinion was conclusory due to lack of objective support for the stated opinion. The court agrees that Dr. Werckle's conclusion that Plaintiff was disabled was the medical (but not a legal) conclusion. *See* Kaputsa v. Sullivan, 900 F.2d 94, 97 (7th Cir. 1989). The court does note, however, the irony of Defendant's discounting Dr. Werckle's opinion while at the same time relying on Dr. Ramchandani's findings, when Dr. Ramchandani spent even less time with Plaintiff than Dr. Werckle.

a treating physician should receive in determining whether an individual is disabled or not. *Compare Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000)(stating "the ALJ properly noted that more weight is generally given to the opinion of a treating physician because of his greater familiarity with the claimant's conditions and circumstances"); *Shramek v. Apfel*, 226 F.3d 809, 814 (7th Cir. 2000)(stating "A physician's opinion regarding the nature of severity of an impairment will be given controlling weight if it is well supported by the medically acceptable ... techniques."), *with Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 917 (7th Cir. 2003)(stating "physicians naturally tend to support their patients' disability claims, and so we have warned against 'the biases that a treating physician may bring to the disability evaluation'")(citing *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001)); *Stephens v. Heckler*, 766 F.2d 284, 289 (7th Cir. 1985)(explaining that "the patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability").

Nonetheless, this court, and the code, give due deference to the treating physicians over non-treating physicians. However, that does not necessarily mean that in every case the treating physicians' opinion will be given controlling weight, regardless of non-treating sources. Rather, a balance must be done between the two sources. "The ALJ's reasonable resolution of conflicts in the evidence is not subject to review, as we do not reweigh the evidence." *Pugh v. Bowen*, 870 F.2d 1271, 1274 (7th Cir. 1989).

The ALJ's Step Four analysis did not clearly designate the medical evidence specifically relied upon in deciding that Plaintiff could perform past work. However, the opinion does show that the ALJ's decision in Step Four was influenced by Plaintiff's positive responses to treatment for her migraines and knee pain, the instances where Plaintiff reported to her doctors that her pain was not severe, and the doctors' descriptions of Plaintiff as "asymptomatic" or "walking

20

with a normal gait." (Tr. 16-17). The ALJ also noted that Dr. Mull's opinion of April 8, 2002, was issued with no physical examination and no office visit since January, 2002. (Tr. 17).

The court's own review of the record for substantial evidence supporting the ALJ's decision denying Plaintiff benefits revealed some evidence that Plaintiff could possibly return to prior work. In particular, on September 22, 1999, a doctor at the Orthopaedic and Arthritis Clinic of Rockford stated that Plaintiff's social history is significant for a job which requires sitting at a desk which she is able to do without difficulties. (Tr. 147). There are also instances of Plaintiff's favorable response to treatments. For example, on August 26, 1999, Plaintiff's knee pain/swelling responded over night to treatment with Vicoprofen (Tr. 271), and on March 10, 2000, Dr. Olson reported that Plaintiff responded well to knee injections and was nearly asymptomatic. (Tr. 156). On April 7, 2000, Plaintiff told Dr. Olson that her pain was not severe, but that it did make her uncomfortable when she was caring for her children. (Tr. 157). Also supportive of the ALJ's findings are the June 12, 2001, report by Dr. Ramchandani finding Plaintiff's gait normal unassisted, and that Plaintiff could squat, get on and off a table without difficulty, pick up objects, and flip pages and the June 25, 2001, state agency physician report finding that Plaintiff could perform medium work with occasional postural limitations – specifically that Plaintiff could occasionally lift fifty pounds, frequently lift twenty-five pounds, and stand/walk/sit (with normal breaks) for about six hours a day.

On the other hand, a fair review of the record also reveals evidence contradicting the ALJ's findings and limiting the persuasiveness of the factors supporting the ALJ's decision. For example, even though Plaintiff responded well to some of her treatments, the overwhelming evidence shows that Plaintiff's treatments provided no long-term relief. (*See, e.g.*, Tr. 187

21

(report of Dr. Meredith noting steroid injections not providing relief); Tr. 250 (Plaintiff returns for another knee aspiration on October 23, 2001); Tr. 252 (Dr. Gordon reports that Plaintiff underwent a six month course of steroids which did not significantly affect her disorder); Tr. 192 (Dr. Malone reports that Plaintiff's knee swelling accumulates once a week, then spontaneously resolves only to return days later)).

Along the same lines, even though Defendant is correct that Plaintiff did characterize her pain as less than severe on one occasion in April of 2000, there are several more instances where Plaintiff's pain is characterized as severe. For example, Plaintiff stated that her migraine pain is usually a nine or ten on a scale of ten, and Plaintiff's migraines have been severe enough for treatment with Demerol injections. (Tr. 204). On April 24, 2001, Dr. Malone stated that Plaintiff's knee swelling is accompanied by severe pain. (Tr. 192). Dr. Mull noted on April 19, 2001, that Plaintiff is awakened at night by her joint pain (Tr. 172), and Dr. Gordon noted on October 18, 2001, that Plaintiff was frequently incapacitated with pain lasting two days at a time. (Tr. 211).

Also, the fact that Plaintiff noted she could work at a desk without trouble in September of 1999 lends very little support to the ALJ's findings. First, Plaintiff did not allege disability until 2000. Second, since 1999, Plaintiff developed migraines and back pain, and her knee pain progressed. (Tr. 289-90, 55). Further, even though Plaintiff worked through hip pain in 2000 largely equivalent to her current hip pain, this is not indicative of her present ability to also work through new back pain, knee pain, and migraines.

Throughout the ALJ's analysis, there is little consideration of how Plaintiff's pain restricts her capabilities. Instead, the ALJ concluded that Plaintiff's "complaints of disabling symptoms and limitations are not considered entirely credible."[3] (Tr. 18). However, this court is unable to find anything in the ALJ's opinion or in the record that undermines Plaintiff's claims of disabling pain. In fact, the record is replete with instances of Plaintiff seeking treatment for her pain symptoms and being prescribed powerful pain medications by multiple doctors. While the ALJ found that the longitudinal record of treatment and evaluation did not fully support Plaintiff's two treating physicians' reports of disabling pain, this court finds the opposite. The few instances referenced in the ALJ's opinion that could appear to contradict Plaintiff's case do not undermine Plaintiff's claims when viewed as a whole.

Even though rational minds may disagree as to the outcomes flowing from testimony presented, the court will uphold the ALJ's decision if substantial evidence underpinning it exists. *See Farrell v. Sullivan*, 878 F.2d 985, 990 (7th Cir. 1989). In this case, the ALJ's findings derive from a very narrow view of the record that does not take account of Plaintiff's pain. Neither does the ALJ point to evidence that contravenes Plaintiff's claims. Considering that the court's own review of the record found very little evidence indicating that Plaintiff could resume prior work, this court cannot hold that substantial evidence exists in the record supporting the ALJ's finding that Plaintiff is capable of performing work which she performed in the past.

---

[3]The ALJ supports his credibility finding by referencing "the reasons set forth in the body of this decision." (Tr. 18). It is not clear what specific reasons the ALJ refers to in the opinion. Instead, the court must infer that the ALJ is relying on the factors mentioned above that could be interpreted as contradicting Plaintiff's claims of disabling pain.

It is the Magistrate Judge's Report and Recommendation that on remand the ALJ's determination as to Plaintiff's RFC be reevaluated in light of Plaintiff's subjective complaints of pain, with due attention to the complete range of medical evidence present in the record.

**E.     Step Five: Is the claimant capable of performing any work existing in substantial numbers in the national economy?**

Having found that Plaintiff was capable of performing work that Plaintiff had performed in the past, the ALJ did not proceed to Step Five.  It is the Magistrate Judge's Report and Recommendation that on remand, the ALJ should proceed to Step Five.

**VII.    CONCLUSION**

In accordance with the above, it is the Magistrate Judge's Report and Recommendation that Plaintiff's Motion for Summary Judgment be granted in part and denied in part and Defendant's Motion for Summary Judgment on the administrative record and pleadings be denied.  The Magistrate Judge further recommends that on remand, the ALJ determine the extent of Plaintiff's pain in light of the complete record and whether any weight should be given to her subjective complaints, and if so, determine a new RFC incorporating her pain.  The ALJ should proceed to Step Five.

ENTER:

**P. MICHAEL MAHONEY, MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT**

DATE: 9/15/04

24